UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BBJ, INC., and WESTON O. GRAVES, | * |
| | * |
|     Plaintiffs, | * |
| | * |
| v. | *    Civil Action No. 12-cv-11305-IT |
| | * |
| MILLERCOORS, LLC, COORS BREWING COMPANY, MILLER BREWING COMPANY, and RENEE CUSACK, | * |
| | * |
|     Defendants. | * |

MEMORANDUM & ORDER

March 8, 2017

TALWANI, D.J.

    This dispute arises from the termination of a business relationship. Presently before the court are Defendants' Motion for Summary Judgment [#204] and Plaintiffs' Cross-Motion for Summary Judgment and Motion to Dismiss And/Or for Summary Judgment on Counterclaim of MillerCoors, LLC ("Cross-Motion for Summary Judgment") [#217]. For the reasons that follow, Defendants' Motion for Summary Judgment [#204] is GRANTED on all counts in Plaintiffs' Third Amended Complaint. [#127]. Plaintiffs' Cross-Motion for Summary Judgment [#217] is GRANTED as to the counterclaim, and otherwise DENIED.

    I.    Facts

    Except as indicated, the facts are taken from the parties' Local Rule 56.1 statements and responses, and are undisputed or not properly disputed for purposes of summary judgment. See Fed. R. Civ. P. 56(c), (e)(2).

In 1998, Plaintiff Weston O. Graves formed Plaintiff BBJ, Inc. ("BBJ"), a corporation doing business as The Sports Team. Graves was BBJ's president and sole owner. Starting in 1998, and continuing annually thereafter through 2008, BBJ entered into a licensing agreement with Molson Coors Global Properties, LLC ("Molson Coors Global"), which gave BBJ the right to manufacture and sell certain Molson Coors Global licensed promotional products. In exchange, BBJ agreed to pay Molson Coors Global a license fee and royalties. The licensing agreement has a forum selection clause requiring all disputes to be resolved by the courts of the state of Colorado.

As a Molson Coors Global licensee, BBJ participated in its licensed promotional merchandise ("LPM") program through which licensees sold certain Molson Coors Global licensed promotional items through a printed catalog (the "LPM catalog") and online website. The LPM catalog was developed by Molson Coors Global and its licensees. A new LPM catalog was published each year and sent to beer distributors and brewery representatives to allow licensees to sell approved promotional items. Licensees such as BBJ managed their own inventory, were responsible for booking sales, and would fill orders placed by distributors or brewery representatives.

In the summer of 2007, Defendant Renee Cusack, then a Molson Coors Global employee whose responsibilities included coordinating Molson Coors Global's licensing program and the LPM catalog, met with BBJ representatives over two days in Massachusetts. At the meeting, Cusack discussed the items BBJ would like to supply for the 2008 LPM Program. During that meeting, Cusack and Graves also had preliminary discussions about a "PTO program," also administered by Molson Coors Global. The PTO program was a promotional and thematic sales program, offering items for specific holidays or events, such as St. Patrick's Day. According to

Plaintiffs, at the meeting, Cusack promised that BBJ would be manufacturing big orders, and that Defendant Coors Brewing Company ("Coors") would pay for the program "100 percent." Pls.' Mem. Supp. Pls.' Opp'n Defs.' Mot. Summ. J, Cross-Mot. Summ. J., Cross-Mot. Dismiss And/Or Summ. J. Counterclaim ("Pl.s' Mem. Supp.") 5 [#221].

In or about October of 2007, BBJ began participating in the PTO Program. Under the PTO Program, the licensee was not responsible for booking sales. Instead, the PTO Program had six ordering periods throughout the course of a year, and distributors or Molson Coors Global could "pre-book orders" for PTO merchandise on the "Coors Resource Center" website. Once pre-booked orders were finalized, Molson Coors Global would give the licensee a final order to produce, and the licensee would fulfill the order and submit an invoice to Molson Coors Global. Molson Coors Global would approve the invoice, and the invoice would be sent to Coors for payment. The licensee would be paid for all final orders that it fulfilled. BBJ's participation was guided by Cusack, who would email BBJ's account sales representative Dave Doucette, telling him which BBJ items would be featured in a given period, when orders would be finalized, and when items would need to be delivered to customers.

On February 6, 2008, Kris Coisman of Molson Coors Global sent an email to Doucette with the subject line "PTO Order Processing and Invoicing." Coisman's email asked BBJ to review the attached "2008 Coors LPM Pre-Order (PTO) Final Order Processing and Invoicing Manual" ("PTO Manual") and send an email confirming BBJ's understanding of the processes outlined therein. The PTO Manual was marked with the Molson Coors Global logo and name, and was entitled "LPM Pre-Order (PTO) Final Order Processing and Invoicing Manual." The PTO Manual stated, "[a]fter we have provided you with your PTO/Pre-Order final quantities and drop ship lists, please follow the process [set forth in the manual] for finalizing and invoicing

your orders." It specified further that "[a]ll invoices must be approved by [Molson Coors Global] prior to submission to [Coors Accounts Payable]" and that "[t]his will allow us to track the amounts going against your PO. If the amount comes close to the total amount then we will have your PO adjusted."

Coisman's February 6 email noted that upon receipt of a confirmation email from BBJ, Coisman would send a Purchase Order and Finalizing Spreadsheet. The following day, after receiving the requested confirmation, Coisman sent an email attaching a Purchase Order and "Finalizing Spreadsheet for the 2008 Coors PTO Program." The email continued with several reminders, including that "[a]ll invoices have to be approved by [Molson Coors Global] before being submitted to [Coors] for payment." The attached Purchase Order, dated February 6, 2008, bears Coors' name and logo on one corner and lists "The Sports Team" as the supplier, the Item purchased as "2008 PTO Merchandise Program," the "Quantity" as 1,900,000 units, the "Price per Unit" as $1.00, the Net Value as $1,900,000.00, and the delivery as December 28, 2008. On May 26, 2008, Molson Coors Global dissolved and assigned its intellectual property assets to Coors. On July 1, 2008, Coors, Defendant Miller Brewing Company ("Miller"), and two other entities began operating Defendant MillerCoors, LLC ("MillerCoors") as a joint venture. As part of the joint venture, Coors assigned all of its United States intellectual property assets to MillerCoors, including those assets associated with the 2008 Molson Coors Global License Agreement. Cusack's employment moved with the intellectual property assets, from Molson Coors Global to Coors in May 2008, and then to MillerCoors in July 2008.

On March 19, 2009, MillerCoors and BBJ executed a new License Agreement, enabling BBJ to manufacture and sell products displaying MillerCoors trademarks, copyrights, and trade

4

dress. Like the Molson Coors Global agreements, this agreement also has a forum selection clause.

On April 13, 2009, MillerCoors informed BBJ that the 2009 MillerCoors License Agreement was being terminated for unethical conduct.

In June 2009, a sales manager for MillerCoors forwarded to distributors an email from an account director for the Integer Group (a MillerCoors subsidiary) stating that BBJ was let go and that Doucette works for a BBJ competitor, along with a note from a MillerCoors employee stating that BBJ "will no longer be a preferred vendor."

At the time of the termination, BBJ had a PTO order in progress that BBJ subsequently completed. BBJ also had available for sale additional branded inventory of the same items that were presold through the PTO program. MillerCoors' Manager of Strategic Sourcing and Licensing subsequently wrote that MillerCoors would extend BBJ's sell-off period for existing inventory to December 31, 2009. In a December 15, 2009, email, Graves requested that MillerCoors purchase BBJ's remaining branded merchandise in inventory, but MillerCoors' manager responded that MillerCoors would not purchase the inventory.

In May 2010, another MillerCoors employee sent an internal email to other MillerCoors employees stating that MillerCoors was no longer conducting business with BBJ due to some "past unethical conduct."

Also in 2010, BBJ assigned its assets and claims to another entity for the benefit of BBJ's creditors.

On November 26, 2013, the company to which the claims were assigned released back to BBJ the right to sue MillerCoors and any other person or persons.

II.	Standard

Summary judgment is appropriate in the absence of a genuine issue of material fact, when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Where the parties have cross-moved for summary judgment, the court "evaluate[s] each motion independently and determine[s] 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" Matusevich v. Middlesex Mut. Assurance Co., 782 F.3d 56, 59 (1st Cir. 2015) (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)). To the extent facts are disputed, they are considered in the light most favorable to the non-movant and reasonable inferences will be drawn in favor of the non-movant. Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Adickes v. S.H. Kress Co., 398 U.S. 144, 157 (1970)) ("[A] court must view the evidence 'in the light most favorable to the opposing party.'").

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted); Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (quoting Pagano v.

6

Frank, 983 F.2d 343, 347 (1st Cir. 1990)) ("To defeat a motion for summary judgment, the evidence offered by the adverse party cannot be 'merely colorable' or speculative.").

    III.    <u>Discussion</u>

        A.  Standing

Defendants assert that all of BBJ's claims must be dismissed for lack of standing because they were assigned to another entity for the benefit of creditors before litigation commenced in 2012. Plaintiffs counter that the right to sue MillerCoors and any other person or persons claims was subsequently released back to BBJ.

Article III standing is determined at the time a case is filed. See <u>Ramirez v. Sanchez Ramos</u>, 438 F.3d 92, 97 (1st Cir. 2006). To establish standing under Article III, a litigant must show, among other things, that it "suffered an injury in fact." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). Here, there is no dispute that BBJ claims sufficient injury for Article III standing.

At the time the suit was initiated, however, BBJ was no longer the real party in interest because it had assigned the claims away. Rule 17(a)(1) of the Federal Rules of Civil Procedure provides that "[a]n action must be prosecuted in the name of the real party in interest." "The basic purpose of Rule 17(a)'s insistence that every action be prosecuted in the name of the real party in interest is to protect a defendant from facing a subsequent similar action brought by one not a party to the present proceeding and to ensure that any action taken to judgment will have its proper effect as res judicata." <u>Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt., Inc.</u>, 620 F.2d 1, 4 (1st Cir. 1980). Defendants might have had this exact concern if the claims had remained assigned to the third party.

7

But Rule 17 also ensures that the real party in interest rule is not used to preclude cases from being heard on the merits in appropriate circumstances. Accordingly, Rule 17(a)(3) provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Here, the purposes of the real party in interest rule have been served, as the reassignment back to BBJ protects Defendants from facing a subsequent similar action brought by the former assignee. Accordingly, the court finds ratification in the reassignment of the claims back to BBJ, and considers Article III standing "as if [the action] had been originally commenced by the real party in interest." Id. Standing requirements have been met, and no dismissal is appropriate.

### B. Plaintiffs' Contract and Fraud Claims

The court previously found that a forum selection clause in BBJ's licensing agreement with MillerCoors barred Plaintiffs from bringing claims under the licensing agreement against MillerCoor, the entity that terminated the license agreement allowing BBJ to sell licensed promotional material. Order [#125]. Plaintiffs' remaining contract and fraud claims focus on Plaintiffs' relationship with Coors and Cusack's statements purportedly made on behalf of Coors.

#### 1. Plaintiffs' Contract Claims

Plaintiffs claim that Coors required BBJ to carry an inventory of licensed promotional material, and that Coors breached this contract by canceling BBJ's participation in the PTO

8

Program, leaving BBJ with unsold branded inventory. Defendants argue that BBJ has no contract with Coors.

To find a contract, Plaintiffs assert first that Cusack "acted as an agent for Coors," and had actual or apparent authority to do so when she purportedly promised that BBJ would be able to sell through licensed merchandise BBJ inventoried for the PTO Program. "Actual authority is a product of 'mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control.'" CNE Direct, Inc. v. Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016) (quoting Theos & Sons, Inc. v. Mack Truck, 729 N.E.2d 1113, 1119 (Mass. 2000)). The record contains no evidence of any express consent manifested between Coors and Cusack, or between Coors and Cusack's employer, Molson Coors Global, that Cusack could act on Coors' behalf. Nor have Plaintiffs pointed to any evidence that Coors had the right to control Cusack's actions. Without evidence of Coors' control, there can be no finding of actual authority. See Brown-Forman Corp. v. Alcoholic Beverages Control Comm'n, 841 N.E.2d 1263, 1270-71 (Mass. App. Ct. 2006) (quoting Spencer v. Doyle, 733 N.E.2d 1082, 1086 (Mass. App. Ct. 2000)) ("[A]n essential characteristic of an agency relationship is the right of a principal to control 'what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times.'").

Plaintiffs alternatively argue that Cusack had apparent authority to bind Coors. "Apparent authority arises when the principal . . . says or does something that 'reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'" CNE Direct, Inc., 821 F.3d at 151-52 (quoting Theos & Sons, Inc., 729 N.E.2d at 1120). Apparent authority only exists if it was reasonable for Plaintiffs to believe that agency existed. Theos & Sons, Inc., 729 N.E.2d at 1122. Here, there is no

9

evidence in the record of any actions by Coors from which it would reasonable for Plaintiffs to believe that Coors had authorized Cusack to make promises on its behalf. At the time of the purported promises, Cusack was employed by Molson Coors Global, the entity that held the intellectual property at issue, and was meeting with BBJ about selling Molson Coors Global's licensed promotional material.

Plaintiffs also argue that Coors ratified Cusack's promises and representations by the subsequent course of conduct between the parties, and in particular, by issuing the February 2008 Purchase Order for $1.9 million in February 2008, and by paying BBJ's PTO program invoices. Yet nothing in the Purchase Order or that conduct makes any reference to, let alone ratification of, promises purportedly made on Coors' behalf. The course of conduct confirms ongoing dealings directed by Molson Coors Global. The Purchase Order was sent by another Molson Coors Global employee, Kris Coisman. Before sending the Purchase Order, Coisman asked BBJ's sales representative to review the processing and invoicing manual, and to confirm BBJ's understanding of the processes outlined therein. The attached manual – though referred to by Coisman as a Coors manual – is marked with Molson Coors Global logo and name. The title specifically mentions LPM – that is, licensed promotional material – to which Molson Coors Global held the license. Indeed, while Plaintiffs would have the court find an agreement with Coors for Plaintiffs' sale of licensed products, the record is undisputed that the license to the products being sold was held by Molson Coors Global.

The manual states further that "[a]fter we [Molson Coors Global] have provided you with your PTO/Pre-Order final quantities and drop ship lists, please follow the process below for finalizing and invoicing your orders." To invoice orders the licensee must "E-mail invoice (sample invoice below) to Molson Coors Global Properties (MCGP) . . . Once approved by

MCGP submit the invoice to Coors Accounts Payable (CBC A/P) using one of the methods below . . ." The manual further states that "[a]ll invoices must be approved by MCGP prior to submission to CBC A/P." After receiving confirmation of BBJ's review and acceptance of the manual, Coisman sent the Purchase Order, along with "a couple of reminders," including that "[a]ll invoices have to be approved by [Molson Coors Global] before being submitted to [Coors] for payment." Against this background, Plaintiffs' claim that the Purchase Order somehow served as Coors' ratification of Cusack's purported promises is unsupportable.

Nor does the Purchase Order itself serve as an independent contract between BBJ and Coors requiring (and allowing) BBJ to carry, and Coors to purchase, licensed inventory. The PTO manual explains that licensees would be paid based on final, approved <u>invoices</u>, not on the Purchase Order, that the Purchase Order would be used only for tracking sales, and that the Purchase Order would be adjusted where sales differed from final invoices. Indeed, as Graves explained: "they sent us a – I guess what I would call almost a blank PO with probably an estimate of sales . . . ."

The Purchase Order itself states that it is for 1,900,000 items at $1.00 per item, to be delivered to Coors by December 28, 2008. Plaintiffs do not dispute that there was no agreement to provide 1,900,000 worth of $1.00 items to Coors, and Graves did not expect to sell 1,900,000 items at $1.00 each. Instead, Plaintiffs argue that the Purchase Order represented a commitment by Coors to do $1.9 million worth of business with BBJ, and that the specific goods and quantities that Coors would order from BBJ would be furnished later. But the Purchase Order states no such thing, and it fails to set forth essential terms of the purported oral agreement between the parties. Not only are the type of products, amounts and prices omitted, but the supposed agreement contains no provisions regarding its duration or its termination. As such, the

11

Purchase Order is too indefinite to create an enforceable contract between Coors and BBJ. See Cousin v. Sofono, Inc., 2003 WL 22391233, at *5 (D. Mass. Oct. 17, 2003) ("[T]hough all terms of a contract need not be precisely specified, the writing must specify all the *essential* terms of the oral agreement before a court will enforce it."); compare Brightwater Paper Co. v. Monadnock Paper Mills, 161 F.2d 869, 871 (1st Cir. 1947) (finding a contract existed only where there was sufficient certainty as to the obligations of both parties).

In sum, the record evidence is insufficient for a jury to find any contract between BBJ and Coors independent of BBJ's licensing agreements with Molson Coors Global or MillerCoors.

Defendants argue further that Graves is not a party or beneficiary to any of the contracts between BBJ and Defendants. Defs.' Memo. 7-8 [#237]; Defs.' Facts ¶¶ 25, 76, 91-92, 183. Plaintiffs respond that Graves personally guaranteed corporate debts incurred by BBJ in connection with Coors. But providing capital to BBJ did not make Graves a party to any contract with Coors. "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000). Plaintiffs provide no evidence that the parties intended or believed Graves personally to be a party to any contract. Nor is there evidence from which to find that the parties intended Graves to be a third-party beneficiary to any contract. "Under Massachusetts law, a plaintiff seeking to enforce a contract as a third-party beneficiary must demonstrate from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance." Alicea v. Machete Music, 744 F.3d 773, 784 (1st Cir. 2014) (internal quotation marks omitted). There is

no evidence on the record from which the court can find the parties "clearly and definitely" intended Graves to be a beneficiary of any contract.

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED on Plaintiffs' contract-based claims Count IV (Breach of Covenant of Good Faith and Fair Dealing) and Count V (Breach of Contract).

2. Plaintiffs' Fraud Claims

Plaintiffs also allege that Coors and Cusack fraudulently induced Plaintiffs to inventory big ticket licensed promotional items when these Defendants knew or reasonably should have known that Coors would not assist Plaintiffs to sell through branded and logoed inventory. As argued by Plaintiffs, at the summer 2007 meeting, Cusack promised that BBJ would be manufacturing big orders, and that Coors would pay for the program 100 percent. Plaintiffs contend that Coors and Cusack also asked BBJ to carry extra merchandise in inventory for last minute orders, and that Cusack assured Plaintiffs that Coors would make sure excess inventory was sold through. As argued by Plaintiffs, Coors also knew that in order to meet deadlines, BBJ had to get a head start on production for products coming from overseas.

To recover for fraudulent misrepresentation under Massachusetts law, Plaintiffs must show that Coors or Cusack "'made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon . . . .'" Masingill v. EMC Corp., 870 N.E.2d 81, 88 (Mass. 2007) (quoting Kilroy v. Barron, 95 N.E.2d 190, 191 (Mass. 1950)). For a negligent misrepresentation claim, the defendant must have made the false statement without a reasonable basis for believing it to be true. See O'Connor v. Merrimack Mut. Fire Ins. Co., 897 N.E.2d 593, 600 (Mass. App. Ct. 2008); see also Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 47 (Mass. 2009) ("Unlike fraud, negligent

13

misrepresentation does not require an intent to deceive or actual knowledge that a statement is false."). For both claims Plaintiffs must also prove that reliance on the false statement was reasonable. See Cumis Ins. Soc'y, Inc., 918 N.E.2d at 48; Ruggers, Inc., v. United States Rugby Football Union, Ltd., 843 F.Supp.2d 139, 146 (D. Mass. 2012).

Plaintiffs have offered little evidence of any false statement that Coors would purchase excess inventory of big ticket items, relying primarily on Graves' testimony about general statements that Cusack purportedly made in the summer of 2007 and about his practice of ordering inventory in advance to meet fulfillment deadlines once final orders were placed. But even if such evidence was enough to get to the jury on the question of whether such promises were made, there simply is no evidence from which a jury could conclude that reliance on the purported statements was reasonable. The PTO program was described in the PTO Manual, and Molson Coors Global obtained confirmation of BBJ's understanding of the processes outlined therein before sending the 2008 purchase order. Defs.' Facts ¶ 60 [#206], Ex. 5 [#206-6]. The licensing agreement allowing BBJ to sell licensed material was made with Molson Coors Global. In the face of that manual and the licensing agreement with Molson Coors Global, a jury could not find Plaintiffs' alleged reliance on a purported promise from Coors to purchase whatever excess licensed goods Plaintiffs decided to keep on inventory reasonable.

As Plaintiffs have failed to support their fraud and misrepresentation claims with any evidence in the record, Defendants' motion for summary judgment on Count I (Fraud and Deceit) and Count III (Intentional and/or Negligent Misrepresentation) is GRANTED.

###### 3. Plaintiffs' Claims in Equity

Plaintiffs likewise cannot point to evidence in the record to support their equity based claims. Promissory estoppel requires that one party make a promise that induces another to

reasonably rely on that promise. Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178 (Mass. 1995) (requiring "an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation"). In Massachusetts, where written documents fail to support alleged oral promises, the law also requires a reasonable person to investigate further. Plaintiffs can't choose to believe in the more appealing of the two statements. See McMahon v. Dig. Equip. Corp., 162 F.3d 28, 39 (1st Cir. 1998); Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1031 ("[I]n some circumstances a plaintiff's reliance on oral statements in light of contrary written statements is unreasonable as a matter of law."). While Plaintiffs argue that they relied on certain oral promises, none of the written correspondence between the parties supports their contention.

To state a claim for quantum meruit, Plaintiffs must allege that they conferred a measurable benefit upon Coors, that a reasonable person in Coors' position would have accepted the services with the expectation of compensating Plaintiffs, and that Plaintiffs provided the services with the expectation of receiving compensation. "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party. The injustice of the enrichment or detriment equates with the defeat of a person's reasonable expectations." Liss v. Studeny, 879 N.E.2d 676, 682 (internal citation and quotation marks omitted). Plaintiffs argue that at the time Coors purportedly repudiated its contract, BBJ had PTO merchandise in inventory or on order from overseas totaling at least $1.4 million. Plaintiffs argue that it acquired this PTO merchandise in reasonable reliance on Coors' Purchase Order and Cusack's promise that Coors would make sure BBJ sold it through. Again, Plaintiffs have no evidence permitting a jury to find that it was reasonable for Plaintiffs to assume that any inventory they unilaterally chose to order – without waiting for a final order –

would be bought by Coors. Nor is there any evidence that Plaintiffs conferred a measurable benefit on Coors. The written exchanges between the parties provide that only final orders in the PTO Program would be compensated. Plaintiffs cannot now recover from Defendants for any excess inventory BBJ ordered. Moreover, Plaintiffs have offered no evidence that they conferred a measurable benefit on Coors by ordering excess inventory.

Without any evidence in the record to show that Plaintiffs' reliance was reasonable, Defendants' motion for summary judgment on Count VI (Quantum Meruit) and Count VII (Promissory Estoppel) is GRANTED.

C. Plaintiffs' Claims for Interference with Advantageous Commercial Relations and Commercial Disparagement

Plaintiffs argue that Coors interfered with advantageous commercial relations by knowingly inducing a break in Plaintiffs' customer relationships. "To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by defendant's actions." Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007). Plaintiffs also argue that Coors, MillerCoors and Miller are liable for commercial disparagement. To prevail on a commercial disparagement claim, "a plaintiff must demonstrate that a defendant (1) published a false statement to a person other than the plaintiff; (2) of and concerning the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss." HipSaver, Inc. v.

Kiel, 984 N.E.2d 755, 763 (Mass. 2013) (internal quotation marks omitted). In Massachusetts, the commercial disparagement standard for reckless disregard for the truth mirrors the actual malice standard of defamation cases. Id. at 767 ("This particular element of a cause of action for commercial disparagement mirrors what has been termed 'actual malice' in the defamation context.").

The parties dispute the truth of the underlying factual basis which MillerCoors gave as its reason for cancelling Plaintiffs' License Agreement. That dispute, however, is not material to the summary judgment motions because Plaintiffs have failed to provide evidence that MillerCoors published those underlying facts or made any other allegedly false statements published to Plaintiffs' customers. Plaintiffs point to a June 2009 email from a MillerCoors sales manager that was sent to distributors who were BBJ customers. Its statements that BBJ had been let go and was not a preferred vendor were truthful. Nor were Defendants barred from telling distributors that a particular vendor was no longer being used.

Plaintiffs also point to an email from another MillerCoors employee as evidence of commercial disparagement. The email, written on May 26, 2010, stated that MillerCoors was no longer conducting business with BBJ due to some "past unethical conduct." While Plaintiffs argue that the statement is disparaging, the evidence on the record demonstrates that the email was an internal email sent only to MillerCoors' employees. As Defendants' email was only sent internally to other MillerCoors employees, Plaintiffs have failed to prove the first element of a commercial disparagement claim: that the statement be published.

Likewise, an email from the same MillerCoors employee to other MillerCoors employees, which provided specifics of a 2006 audit of BBJ that employee conducted, does not give rise to a commercial disparagement claim. Again, Plaintiffs offer no evidence to support

their contention that this email was sent or published to anyone outside of MillerCoors. Without evidence that Defendants published disparaging statements to BBJ's customers, or otherwise interfered with its customers, summary judgment is GRANTED on Count VIII (Interference with Advantageous Commercial Relations) and Count X (Commercial Disparagement).

D. Plaintiffs' Unfair and Deceptive Trade Practices Claim

To bring a claim under Mass. Gen. L. ch. 93A, Plaintiffs "must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by [] ch. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1074-75 (Mass. 2014). An ordinary breach of contract is not an unfair trade practice under ch. 93A. To rise to the level of a ch. 93A violation, a breach must be both "knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party." Zabin v. Picciotto, 896 N.E.2d 937, 963 (Mass. App. Ct. 2008) (quoting NASCO, Inc. v. Pub. Storage, Inc., 29 F.3d 28, 34 (1st Cir. 1994)).

Plaintiffs argue that they worked for many years to build BBJ into a successful business, and that Defendants' refusal to buy excess inventory and the disparaging statements allegedly made to customers eviscerated the company and its ability to continue in the business. Plaintiffs have failed, however, to present evidence from which a jury could find that Defendants' actions amounted to an unfair or deceptive act or practice.

Given the absence of evidence from which a jury could find an unfair or deceptive practice by any Defendant, summary judgment on Count II (Unfair and Deceptive Trade Practices) is GRANTED.

E.  Plaintiffs' Open Account Claim

Plaintiffs also seek recovery from Coors for fifteen invoices that Plaintiffs sent under the PTO Program. However, the basis for Plaintiffs' Open Account claim is fifteen invoices that are addressed to MillerCoors. Plaintiffs cannot recover from Coors for MillerCoors' invoices. Thus, Defendants' motion for summary judgment on Count XII (Open Account) is GRANTED.

F.  Defendants' Counterclaim

Defendants argue that Plaintiffs owe MillerCoors royalties that were due under the March 2009 License Agreement. The License Agreement contains a forum selection clause, however, that requires all claims under the License Agreement to be brought in Colorado courts and using Colorado law. Consequently, Defendants are precluded from bringing their counterclaim in this court. For that reason, Plaintiffs' motion for summary judgment on Defendants' Counterclaim is therefore GRANTED.

IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [#204] is GRANTED on all counts in Plaintiffs' Third Amended Complaint [#127]. Plaintiffs' Motion for Summary Judgment [#217] on Defendants' Counterclaim is hereby GRANTED, and DENIED in all other respects.

Date: March 8, 2017                    /s/ Indira Talwani
                                       United States District Court